Lindsley v. Dodd.

---

JAMES H. LINDSLEY, administrator &c.,

v.

AMZI T. DODD et al.

1. A trustee who has once actually received the funds of the trust estate cannot discharge himself from accounting for the same to the *cestui que trust* by showing that they were lost by his own neglect. In such case, a suit against him by his *cestui que trust* to recover the estate is not based upon his neglect, but upon his actual receipt of the estate; and the case is not varied if the suit be against the devisee of the delinquent trustee.

2. In an action by a *cestui que trust* against the trustee of an express trust to recover the trust estate, laches in bringing of the suit cannot be imputed to the complainant until he is informed of some breach of the trust or culpable negligence on the part of the trustee resulting in a loss, which the latter refuses to make good.

Final hearing on bill, answer and proofs.

*Mr. James E. Howell,* for the complainant.

*Mr. Alfred F. Skinner.* for the defendant.

PITNEY, V. C.

This action, as originally framed, was brought by the admin-istrator *de bonis non cum testamento annexo* of Stephen H. Dodd, late of the county of Essex, deceased, against the several heirs-at-law and devisees of the executors named in the will of said Dodd. Its object is to recover the amount of the estate of said Stephen H. Dodd, once in the hands of his executors, and which has been lost, as is alleged, by their neglect.

The particular act of neglect relied upon is the failure to cause to be filed for record a mortgage for $1,500, given by one Van Orden to the executors, to secure his bond to them for that amount, payable in one year, with interest. After the giving of the mortgage, the land which it covered was sold away from Van Orden by the sheriff of Essex county, by virtue of judgments against Van Orden, and came to be held by *bona fide* purchasers without notice of the unrecorded mortgage, whereby —Van Orden having died insolvent—a total loss has occurred.

The first question is as to the right of the administrator *cum. testamento annexo* to maintain the action.

I think the clear weight of authority in this state, as well as elsewhere, is that, in the absence of a statutory provision giving an ordinary administrator *de bonis non* such right, it does not exist. There is no such statute in this state except in the case of a removal of an executor, administrator or trustee for misconduct, by the probate court, and the appointment of a successor to take his place. In such case, a suit of the nature of the present is expressly authorized, as pointed out by the chief-justice in *McDonald and Glynn* v. *O'Connell's Administrators, 10 Vr. 317.* The case of *Beall* v. *New Mexico, 16 Wall. 535,* seems precisely in point against the right of the administrator to recover in this action, and many authorities are collected by

Lindsley v. Dodd.

Mr. Justice Bradley in his opinion in that case. That suit was, in form, an action by the Territory of New Mexico against the first administrator and his sureties upon his official bond, to recover the amount of the estate of the decedent, as shown by the inventory thereof, made by the first administrator, and which, it was alleged, he had lost by selling it upon credit and failing to take proper security for it. The action, though in the name of the territory, was prosecuted by and for the use of the administrator *de bonis non*, and it was held it would not lie. In the course of his opinion the learned judge says : " For the delinquency of the former administrator in not prosecuting [claims which it was his duty to prosecute], he is responsible to the creditor, legatees and distributees directly, and not to the administrator *de bonis non.*"

This rule was distinctly recognized and applied by Chancellor Zabriskie in *Carrick* v. *Carrick, 8 C. E. Gr. 364,* and is stated to be settled law by the chief-justice in *McDonald and Glynn* v. *O'Connell, supra;* and see, also, *Bradway* v. *Holmes, 5 Dick. Ch. Rep. 311.* The only authority looking the other way is *Lindsley* v. *Personette, 8 Stew. Eq. 355,* decided by Chancellor Runyon. For the reason stated in *Bradway* v. *Holmes,* I feel constrained not to follow *Lindsley* v. *Personette,* and come to the conclusion that the action cannot be maintained by the administrator.

However, this point was not taken in the answer, but the defendant answered fully to the merits, and they were fully gone into at the hearing. The wife of the complainant is the sole legatee and devisee in remainder of the testator, and is the real complainant in the cause. Motion has been made to amend by making her complainant in place of the present complainant, and making him a party defendant. A perusal of the bill shows that this can be done without materially altering its frame or prayer or stating any new matter requiring an answer. Under these circumstances, I think the motion should be allowed. A similar course was pursued in *Bradway* v. *Holmes.*

Looking at the merits, complainant's case, briefly stated, is this : Calvin Dodd and Philip Ward, surviving executors of Stephen H. Dodd, deceased, on the 28th of November, 1873,

held the bond of Isaac L. Van Orden for $3,000, secured by a
mortgage given to them as such executors by Van Orden and
wife, on land in Essex county, which was ample to secure it.
The bond and mortgage bore date March 3d, 1858, and the
mortgage was duly recorded on September 1st, 1858, in the
proper book of records. On or about the 28th of November,
1873, they surrendered these securities to Van Orden and took
in their place a new bond and mortgage to them as executors of
Stephen H. Dodd, to secure $1,500 in one year, with interest,
the mortgage covering a small part only of the land which had
been covered by the first mortgage. The actual surrender of
the old mortgage and the taking of the new mortgage was
probably done on or about the 18th or 19th of December. On
the date last named Van Orden caused the old mortgage for
$3,000 to be canceled of record, but the executors failed and
neglected to cause the new mortgage to be registered or recorded.
Van Orden shortly afterward became financially embarrassed,
judgments were recovered against him, executions thereon were
levied upon the lands covered by the mortgage, and the same
were subsequently sold thereunder by the sheriff of Essex county,
and the title became vested in *bona fide* purchasers for value
without notice of the unrecorded mortgage. Van Orden died
insolvent, and the debt is wholly lost. It abundantly appears
that the value of the property covered by the $1,500 mortgage
is, and always has been since it was given, ample to secure it.
It also appears that neither the complainant nor her mother, who
are the sole beneficiaries under the will of Stephen H. Dodd,
ever had any knowledge or suspicion of the existence of the
$1,500 mortgage until about July, 1889, when it was accidentally
discovered among the papers of Calvin Dodd, one of the execu-
tors, after his death. He died in 1878. In the meantime both
mother and daughter supposed that they had some right and
interest in the lands covered by the old mortgage, which lands
had belonged to Stephen H. Dodd's father, Samuel Tyler Dodd,
and they had made industrious and continued inquiries into the
affair with the view of ascertaining what that interest was, and
whether the purchaser at sheriff's sale of Van Orden's right had

notice of it. Such inquiries commenced shortly after the death of Calvin Dodd in 1878, and the death, which occurred a year or two later, of Eliza Dodd, who was the widow of Samuel Tyler Dodd, and entitled to a life estate in the lands. Such inquiries resulted in discovering the unrecorded mortgage above stated, and that no proof could be produced to show that the holders of the title had any notice. It is proper, however, to remark here that no burden was cast upon the beneficiaries under the will of Calvin Dodd, to show lack of notice to the holders of the title of the lands. The natural presumption is against such notice, and the burden is on the executors or their representatives to show the contrary.

No account was ever rendered by the executors of Stephen H. Dodd of their dealing with the estate, either privately to the beneficiaries, or to the orphans court, or otherwise, so far as appears.

Now it seems to me that these facts show a complete case against the deceased executors. It should be observed that the executors are in reality not sought to be charged because they have lost the estate through their own negligence, though such negligence is stated as a part of complainant's case.

Their liability arises out of their having once had the estate in their possession in the shape of a good bond and mortgage, and they cannot discharge themselves from this liability by saying that they lost that estate by their own breach of trust or negligence in the care of it. This proposition seems so self-evident as to require no authority to support it. There is, however, abundance of authority for that purpose.

In *Burrowes* v. *Gore, 6 H. L. Cas. 907* (at *p. 956*), Lord St. Leonards said: "What is the position of Thomas Burrowes [the trustee] and of Robert Burrowes, his son [the defendant], as his representative? He ought to have the £1,500 in his hands ready to be paid over to the complainants. He is liable in a court of equity as having committed a breach of trust in not having that money forthcoming. * * * In his answer, Robert Burrowes says that he believes that the sums [of money demanded] have * * * been lost through the default of

the trustee to the settlement [Thomas Burrowes]. Lost by the neglect of the trustees! Who are the trustees? *Why, he himself is a trustee at this moment. He is the representative of his father, Thomas, who was himself a trustee.* How is it possible for him for a moment to be heard to say, 'I have lost the money by my breach of trust?' The answer should have been, 'If you have, you will be so good as to pay it.' No trustee can say as a defence, I have committed a breach of trust."

In *Holcomb* v. *Holcomb, 3 Stock. 281* (at *p. 300*), Chancellor Williamson said : "As to the promissory notes and all other debts not properly secured, it was the duty of the executors to have collected them and made them secure. If, by permitting them to remain without security, they afterwards were lost to the estate, it was through the negligence of the executors in not properly discharging their duty, and they must be charged with their loss."

The same principle is recognized in *McCartin* v. *Traphagen, 16 Stew. Eq. 323* (at *p. 334*).

Both executors are dead. Philip Ward left no property, and no defence is made by his heir-at-law. Calvin Dodd, the other executor, left a considerable estate, which, by his will, he gave to the defendant, Samuel T. Dodd, who was his grandson. His executors settled his estate many years ago, and were not made parties.

Several defences are set up by Samuel T. Dodd, the grandson and devisee of Calvin. I will notice them.

*First.* He alleges that, after the giving of the unrecorded mortgage of November 28th, 1873, viz., on December 5th, 1873, seven days later, the present complainant and her mother conveyed, released and quit-claimed all their right, title and interest in the premises covered by the mortgage to the mortgagor, Van Orden. Such a deed, or certified copy of it, is produced, and it covers the whole premises covered by the first mortgage. It purports to be recorded December 19th, 1873, the very day on which the old mortgage for $3,000 was canceled of record.. Now, the giving of this release, whose consideration is $1, by these ladies, who were mere beneficiaries under the will of

Stephen H. Dodd, and not mortgagees, does not and cannot,. upon its face, have the effect of discharging a mortgage given substantially at the same time to the executors of the will of the husband of one and father of the other.   Even if the release had been given by the mortgagee to the mortgagor, no presumption would, under the circumstances, have arisen that it was intended to discharge the mortgage.   The presumption would be all the other way, viz., that the bond and mortgage was given to the executors in consideration, in part at least, of the giving of the release.   The presumption is that if the parties had intended to discharge the mortgage they would have done so directly, and would not have adopted so expensive and round-about a mode as the giving a release within seven days after its date, and before its record, by a person not a party to it.   I shall have occasion farther on to state the circumstances attending the giving of this release.

But in the next place, the defendant, not relying upon the release alone to show that the mortgage never had any vitality, falls back upon the previous history of the dealings of the parties interested in the mortgaged premises.

That history is, briefly, as follows : Samuel Tyler Dodd, the grandfather of the now complainant and the father of Stephen H. Dodd, died seized of them in April, 1849, testate, leaving a widow, Eliza, and seven children, viz., Stephen H., Phebe L. Van Orden, wife of Isaac L. Van Orden, John, Israel, Zebina, James W. and Samuel T.   Some of these children were under age.   So much of his will as bears upon the present question is. as follows :

"*Second.* I give and bequeath to my wife, Eliza, the use of all my household furniture during her widowhood.

"*Third.* I do authorize, empower and direct my executors hereinafter named, or the survivor of them, to sell and convey my lot of salt meadow, lying between meadows of Daniel Dodd and Calvin Dodd, for the best price that can be obtained for the same, and also to sell my personal estate, except the household furniture, and by and with the advice of my son, Stephen H. Dodd, either to sell and convey so much of my real estate as may be sufficient to pay all my just debts, or raise such amount as may be necessary for that purpose by a mortgage upon my real estate, the reason whereof will hereafter appear.

Lindsley v. Dodd.

"*Fourth.* I do authorize my son Stephen H. Dodd to take, or my executors to convey to him, his heirs and assignees, all the remainder of my real estate at the sum of three thousand dollars by his paying to the other of my legal heirs their share of the same as he may agree with them, upon the following conditions, that is to say, all my estate to remain except the amount for debts, which may be sold or mortgaged, for the use of my wife Eliza, if she remains my widow, to maintain and educate my minor children, and when the youngest shall have attained the age of twenty-one years, then one-half the value above mentioned, my just debts and other charges on my estate being deducted from the said three thousand dollars, be paid share and share alike to my heirs, the other half to remain for the support of my wife Eliza during her widowhood and no longer   In case of the marriage or death of my said wife, then my son Stephen H. Dodd to pay my heirs an equal share each, himself included, out of what may remain.   In case my daughter Phœbe should marry before the first dividend of the estate, I direct my son Stephen H. Dodd, should my estate then be in his hands, or my executors, should it not, to give her one hundred dollars, at her marriage, to be deducted from her share in the first dividend."

And he appointed Calvin Dodd and Philip Ward his executors.

Besides the salt meadow mentioned in the will, the testator seems to have died seized of five several tracts of land: one of twelve acres, called the homestead, and one of six acres (these two were afterwards conveyed to Van Orden, and the $3,000 mortgage above mentioned was given as consideration money); two tracts, one containing fourteen acres and forty-one one-hundredths, and the other, contents not given, sold together by the executors in 1851, for $653.50; one containing one-fifth of an acre, sold, in 1857, for $910.   The salt meadow produced $75. Stephen appears to have taken possession of the homestead and to have held it as a home for his mother and younger brothers and sisters while he lived.   In June, 1854, he purchased from his brother, Israel L. Dodd, then just of age, his interest in his father's estate, paying therefor $100 and taking his deed of conveyance for the land, which deed was duly recorded.

Stephen died testate in January, 1856, leaving the present complainant, his only child, about two years old, and his widow him surviving.   By his will he provided as follows:

" I hereby constitute and appoint Calvin Dodd, Philip Ward and Amzi S. Dodd, son of Calvin, of said township, county and state, and their survivors and survivor, executors and executor of this my last will and testament, whom

I do hereby authorize and empower to sell and dispose of my property, real and personal, for the payment of my just debts and charges, and as they shall think expedient from time to time to convey the same in fee simple or for a term of years for the benefit and behoof of my heirs-at-law and to carry out and fulfill the intentions of the will of my father, Samuel T. Dodd, and with the consent of my father's widow to sell, dispose of and invest the proceeds of such sale or conveyance for the benefit of my own and my father's heirs-at-law.

"I give and bequeath unto my loving wife Letitia the residue of my property, real and personal, to have and to hold the same during her widowhood,. and upon her marriage or decease, the same to go to my daughter, her heirs and assigns forever, provided that if my said daughter should die leaving no heirs of her body, then and in that case, the same shall revert to the heirs of my said father deceased."

It will be observed that he named the same executors as those named in his father's will, adding Amzi S. Dodd, who was the son of Calvin Dodd and father of the defendant Amzi T. Dodd.

By deed dated March 23d, 1858, acknowledged March 25th,. 1858, and recorded September 1st, 1858, the three executors. above named—Calvin Dodd and Philip Ward being named as. executors of Samuel T. Dodd, and all three being named as. executors of Stephen H. Dodd—after reciting the power of sale. contained in each will, conveyed the two tracts of twelve acres. (called the homestead), and six acres, respectively, to Isaac L. Van Orden, in consideration of $3,000. In satisfaction of this, consideration, Van Orden and his wife gave back to the three executors, as executors of Stephen H. Dodd only, a bond of like date with the deed, to secure the sum of $3,000,

"or whatever less sum shall be found to be due from the executors of Stephen H. Dodd, deceased, at the time the youngest child of Samuel T. Dodd, deceased, shall attain the age of twenty-one years, to the heirs and for the widow of the said Samuel T. Dodd, deceased, under and by virtue of his last will and testament, which sum hereby required to be paid, and intended to be secured, is the sum which said will directs to be divided into two equal parts, upon the said youngest child's coming of age, one part to be paid to the heirs of the said Samuel T. Dodd, deceased, and the other part to remain for the support of his widow."

This mortgage appears to have been acknowledged March 30th, 1858, before a different master from the one taking the

acknowledgment of the executors' deed, but was recorded on the same day, September 1st, 1858.

The language of the condition of the bond indicates that Van Orden had taken the property upon the same terms upon which it was given to Stephen, viz., at $3,000, and out of this sum Van Orden was to pay the debts of the first testator and support the widow and minor children, and the net balance was to go to and be divided between the children of the first testator, Samuel T. Dodd.

There is further proof that this was the understanding of the parties. A receipt following a statement in the handwriting of Van Orden and signed by the attorney of Letitia H. Dodd, the widow of Stephen, is produced, by which it appears that on May 7th, 1860, two years after this deed was given, Van Orden paid her a balance of $150.89, due on a total of $255.95, composed of $167.37, the amount of divers small debts of Samuel T., paid by Stephen H., and $88.58 of interest thereon.

Further, the bond of Van Orden, above recited, bears the following endorsement in the handwriting of Calvin Dodd, the executor now sought to be charged :

"ORANGE, January 27th, 1859. Received of Isaac L. Van Orden, seventy dollars for Letitia A. Dodd, widow of Stephen H. Dodd, as per receipts $70.00; do. received Isaac L. Van Orden ninety-four dollars for David Riker's account as by receipt $94.00; do. received of Isaac L. Van Orden two hundred thirty-seven $\frac{37}{100}$ dollars one hundred thirty-seven $\frac{37}{100}$ dollars being money advanced for the estate of Samuel T. Dodd's estate, and one hundred dollars for services as executor of estate $237.37.

"CALVIN DODD,
"One of the executors of Stephen H. Dodd, deceased."

This receipt was, I think, intended as a memorandum of credits which Van Orden would be entitled to upon the sum of $3,000 at the time the youngest child came of age. What became of the interest on the whole sum or how much went to support Eliza, the elder widow, and how much to educate the children, does not appear.

Another document produced by the defendant is as follows:

Lindsley v. Dodd.

"$75.                                             Orange, Dec. —, 1861.

"Received of I. L. Van Orden, seventy-five dollars, being an installment on :a dividend of one hundred and fifty dollars payable to each of the heirs of the late Samuel T. Dodd from his estate, the other half òf said hundred and fifty dollars I direct to be paid to the order of Eliza Dodd, and endorsed upon an order given to her for one hundred and seventy-five dollars upon the executors ·of the estate of Stephen H. Dodd, deceased.

"Letitia A. Dodd.

·"*Executors of estate of Stephen H. Dodd, deceased :

"Pay to the order of Eliza Dodd, one hundred and seventy-five dollars, as follows: Seventy-five dollars of the amount now due the estate of Stephen H. Dodd, deceased, from the estate of Samuel T. Dodd, deceased, and the balance of one hundred dollars to be paid when the next dividend comes due, which total amount you will charge to the estate of Stephen H. Dodd, deceased.

"Letitia A. Dodd."

A close study of these memoranda indicates that the accounts, stated roughly, stood thus :

Land sold by the executors in Stephen's life-
    time......................................................$653 50
After his death.......................................... 985 00
                                                         ———————
    Total.............................................        $1,638 50
Debts paid by Stephen, as per Van Orden's
    memorandum.........  .............  ...............$167 31
Interest on that.......................................... 26 5ʹ
Advanced by Calvin Dodd............................... 108 35
Interest.......................  ......................... 29 02
Calvin Dodd's charges................................... 100 00
Riker's bill............................................... 94 00
                                                         ———————
    Total.............................................         525 25
                                                              ———————
Which, deducted from $1,638.50, leaves in the execu-
    tors' hands............................................. $1,113 25

a sum quite sufficient from which to make a dividend of $150 each to six children, John having previously died intestate and unmarried, and leave untouched the half of the $3,000 which, by the will of Samuel T. Dodd, was to be divided at the majority of his youngest child. This balance remaining from the sale of the out lots must be the fund from which this dividend was declared, since, as will appear farther on, the youngest child did not attain majority until about 1870. But the conveyance

for value of Israel's share in the land to Stephen in his lifetime,. and before the several conveyances by the executors, gave Stephen the right to have Israel's share in the net proceeds of those sales and increased his interest from a sixth to a third.

In the meantime, in August, 1858, after the date of the executor's deed, but before its record and the record of the $3,000 mortgage Van Orden procured to be executed by Zebina Dodd, Israel Dodd and James W. Dodd, three of the children of Samuel Tyler Dodd, a deed conveying to him, in consideration of $1,000, the same land comprised in the executors' deed. The wives of Zebina and Israel are named as grantors in that deed,. but they did not execute it until 1873. Samuel T. Dodd, another of the children of Samuel Tyler Dodd, is also named as a. grantor, but by reason of his infancy did not execute it until about the time it was recorded—December, 1873. This deed was recorded on the same day that the first mortgage was canceled, viz., December 19th, 1873, though executed by three of the grantors many years before. The four children named in and who executed it—Zebina, Israel, James and Samuel—comprised all the living children of Samuel Tyler Dodd the elder,. except Mrs. Van Orden.

On the same day, December 19th, 1873, Van Orden lodged for record a deed from his mother-in-law, Mrs. Eliza Dodd, the widow of Samuel Tyler Dodd, which, in consideration of $1, released to him all her interest in the mortgaged premises. This conveyance, as well as the release from Mrs. Letitia Dodd and her daughter, the complainant, was prepared by and executed in the presence of Mr. Edward D. Pierson, an attorney practicing in Orange, since deceased.

The procuring of these releases from the two widows and the putting of them on record on the same day that the old mortgage was canceled, and the fact that the unrecorded mortgage covered only a very small part of the whole premises—two hundred feet by one hundred and sixty feet, less than three-quarters. of an acre—indicates that some question had been raised as to. the sufficiency of the conveyance of 1858 made by the joint executors to Van Orden. In no other way can I account for

the trouble taken to procure and record releases from the two widows and the complainant and all the surviving children.

With regard to the release from Mrs. Letitia Dodd, widow of Stephen H., and her daughter, the now complainant, it purports to be in consideration of $1 ; and the proof is clear that nothing was paid for it. The evidence of Mrs. Lindsley, the complainant, upon this subject, was given in such a manner as to command belief in the honesty of the witness and reliance in the accuracy of her evidence. At the date of its execution she was just past twenty-one years of age, was living with her mother and engaged in teaching a public school in the city of Orange, about a mile from their residence. She was called upon at the school-house, during school hours and while in the midst of her school duties, by Mr. Van Orden and Mr. E. D. Pierson, and asked to sign the deed in question. She was told by one of them that her mother had already signed it. She had just commenced teaching that school, and was agitated and excited. No previous appointment had been made for that purpose, nor had the subject been previously mentioned to her by anybody. As a reason for wishing the release signed, Pierson said to her, in Van Orden's presence:

"Mr. Pierson said that Mr. Van Orden wished to make some improvements on the property, and that he could not make them without my signature, and told me it was to my interest that these improvements should be made, and wanted me to understand distinctly that it did not cut me off one cent. Those were his exact words. And he reiterated that remark to me in the aisle as he passed out. He said: 'You understand that this don't cut you off one cent.'"

And, again, on cross-examination:

"Q. You say he told you it would not cut you out?
"A. He told me it would not cut me off one cent.
"Q. Then what did you think you were signing?
"A. I thought I was simply giving Mr. Van Orden permission to go ahead and improve the property; that was the idea I had."

Now, if we give full effect to all the foregoing evidence and draw every inference it will bear in favor of the defendant, it still falls short of showing that, in December, 1873, when the

old mortgage was canceled, it had been fully paid. This would be the result leaving out of view the fact that the new mortgage for one-half the amount was given back at the time of its cancellation. Taking that into account, in connection with the clause in the will of Samuel Tyler Dodd providing for dividing the estate when the youngest child attained majority, I think it clear enough that the cancellation of the old mortgage and the giving of the new one were brought about in this wise: Van Orden was able to satisfy the executors, or rather Calvin Dodd, for the evidence shows that he was the acting executor, by the production of the releases from the four children, given for a consideration, or by other means, that $1,500 was all that was due, and the new bond and mortgage was given for that amount, and that it should have been, and but for the failure to record it and the insolvency of Van Orden would have been, a valid security for that sum.

In the next place, the defendant relies upon great lapse of time, and pleads the statute of limitations.

It will be observed that, by the will of Stephen H. Dodd, his estate was given to his wife during her widowhood. She did not marry a second time, and died October, 1892, less than six months before the present bill was filed. Up to that time, the present complainant had no right at law to sue the executors or their representatives for the residue of the estate. She may have had, and probably did have, a right to call them to an account in order to ascertain the exact amount and condition of the estate in their hands, and if she was aware that there had been any loss of the estate by their neglect, it may be that she had, as a person interested in the preservation of the fund, the right to come into equity and compel them to make it good in advance of the maturity of her right of enjoyment. But if that is so, I still do not see how she can be said to be in laches in not pursuing such right before she knew of the default out of which it arose. And it is clear that she had no knowledge of this default until the unrecorded mortgage was found in July, 1889. It is abundantly clear, as before remarked, that neither the complainant nor her mother ever knew anything definite about the

·details of the dealings with the two estates.   They saw the two wills, and understood that the right, whatever it was, of the present complainant, was subject to her mother's life estate, and that the rights of both mother and daughter were subject to the life right of Eliza, the widow of the elder Dodd ; and she lived until 1879, having survived Calvin Dodd, the executor, by one year.

Now, the complainant swears that her mother called on Calvin Dodd about her and her daughter's supposed right in this land, and that her mother informed her that Mr. Dodd said that their rights were secured, in some unexplained way, in the property, but that no settlement of it could be made until the elder widow, Eliza, died.   That explanation was probably strictly true, for it is quite probable that Van Orden, who was living on the homestead with his mother-in-law, claimed that she was entitled to the interest on the $1,500 during her life.

The judgments went against Van Orden in July and August, 1875, and amounted to a small sum, considering the value of the land over and above all encumbrances at that time.   They were sold by the sheriff, for the comparatively trifling sum of $490, to John A. Van Orden, a brother of Isaac, and one Josiah F. Dodd, a neighbor but not a relative.   Calvin Dodd was a near neighbor.   Subsequently John A. Van Orden conveyed his interest to Josiah F. Dodd.   The circumstances of the conveyance render it probable that if Calvin Dodd had at that time—that is, shortly after the sale—discovered or known that his mortgage was not recorded, he might have saved it by recording it after the judgments, because the land was worth enough to pay both the judgments and the mortgage, and it is by no means improbable that he could have enforced it against Josiah F. Dodd and John A. Van Orden, even after the sale. The circumstances also indicate that Calvin Dodd did discover that the mortgage was unrecorded at a period some time after the sheriff's sale.   I infer this from his failure to mention its existence to Mrs. Letitia Dodd in her various interviews with him, in which he put her off until after Eliza's death.   Certain it is that so far as appears he never did state to Mrs. Letitia

Dodd that her claim under her husband's will was satisfied, but always encouraged her to believe that it was still alive, in force and secure; and equally certain it is that he never disclosed to her the existence of the mortgage. It is impossible to account for the condition of the minds of the mother and daughter, as shown by the evidence, upon any other theory.

After the death of the elder widow and life tenant, Mrs. Letitia Dodd, widow of Stephen, prosecuted her inquiries, and therein had the assistance of a competent member of the New York bar, who gave his aid without charge. He had no suspicion of any mortgage, but after examining the records and getting what information the two ladies could give him, went upon the hope that, under the circumstances, he might make out a case of an equitable interest in their favor in the land, and that the purchaser at the sheriff's sale had notice of it.

There can be no doubt that Calvin Dodd occupied, in this matter, the position of a trustee of an express trust toward the complainant. And it is equally certain that the neglect of duty which led to the loss occurred as early as the time of the recovery of the judgments in 1876, if not in 1873, the date of the mortgage.

The statute of limitations does not, in express terms, apply to equitable actions. Nevertheless, courts of equity feel bound to follow and apply it in all cases where an action at law is a concurrent remedy. *Bank* v. *Veghte, 15 Stew. Eq. 39.* And also in cases of acquiescence in wrongs for remedy of which the party must come into equity, where the party has acquiesced in the wrong for the statutory period with knowledge of his rights, and without excuse for the delay. *1 Pom. Eq. Jur. § 419.* Actions by a *cestui que trust* against his trustee, where the trust is what is called an express one cognizable only in equity, are usually not within the statute of limitations as applied in equity, for the reason that ordinarily the possession of the trustee is the possession of the *cestui que trust.* Their attitude toward each other is not hostile or antagonistic, and there is no cause of action to be barred. *Dyer* v. *Waters, 1 Dick. Ch. Rep. 485,* and cases.

But if the trustee of an express trust has assumed a hostile

Lindsley *v.* Dodd.

attitude against the *cestui que trust*—has disavowed the trust and ·denied the right of the *cestui que trust,* or has committed a breach of trust, resulting in the loss of the estate, which has come to the knowledge of the *cestui que trust,* and has refused to make it ·good—then there is a present cause of action by the *cestui que trust* against the trustee, and the case so presented seems to me not to be within the rule that the statute of limitations does not run against an express trust. Nevertheless, there are numerous authorities which hold that the statute of limitations does not run in equity against such a breach of an express trust. *2 Lew. Trusts (Flint's ed., 8th Eng. ed.)* §§ *900, 901 ; Metropolitan Bank* v. *Heiron, 5 L. R. Exch. Div. 319 (1880)* (at *p. 325*) : " Where a trustee has a fund in his possession and wastes it either by neglect of duty or by doing an act not justified, and the *cestui ·que trust* comes to recover his money, no time will bar his suit, for it is a claim by the *cestui que trust* against the trustee for money or property which was in the possession of the trustee, ·and must be considered as in the possession of the trustee for the benefit of the *cestui que trust* until the trustee duly discharges ·himself. To such a suit there is no bar by statute."

See, also, *Obee* v. *Bishop, 1 De G., F. & J. 137* (at *p. 140*) ; *Woodhouse* v. *Woodhouse, L. R. 8 Eq. Cas. 514 ; Burrowes* v. *Gore, 6 H. L. Cas. 907 ; Butler* v. *Carter, L. R. 5 Eq. Cas. 276 (1868)* ; *Brittlebank* v. *Goodwin, L. R. 5 Eq. Cas. 545 (1868).* In this case there is a review of the authorities. The case itself is very much in point with the one before the court, and it has been cited with approval and followed in many other cases. *In re Cross, Harston* v. *Tenison, L. R. 20 Ch. Div. 109 (1881)* (at *p. 121*), Lord-Justice Baggallay, in his written judgment, said : " With reference to the contention that any ·claim which the parties interested in the trust estate, whether as trustee or *cestui que trust,* ever had against Hannah Cross, was barred by the statutes of limitation before the present action was commenced, it is sufficient to state the recognized doctrine of equity that as between the trustee and the *cestui que trust* no time will operate as a bar to the equitable claim of the latter in respect of a breach of an express trust ; the second rule of the

Lindsley v. Dodd.

twenty-fifth section of the Judicature act of 1873, which provides that 'no claim of a *cestui que trust* against his trustee for any property held on an express trust, or in respect of any breach of such trust, shall be held to be barred by any statute of limitations,' is but a statutory declaration of a law which had always been recognized and administered in courts of equity."

See, also, *Story* v. *Gape, 2 Jur. (N. S.) 706 ; Williams* v. *McKay, 13 Stew. Eq. 189 ; Williams* v. *Reilly, 14 Stew. Eq. 137.*

Conceding, however, that for a direct and open breach of trust, avowed by the trustee, and for which he refuses to make amends and places himself in an attitude of hostility to his *cestui que trust*, the court ought to apply the rule governing in other cases of equitable wrongs, yet it is entirely clear that such rule will not be applied unless the injured *cestui que trust* has notice and knowledge of the injury and the right growing out of it. Just here is found the radical weakness in the trustees' plea of laches.

It is quite clear in this case that complainant has not knowingly slept on her rights for the statutory period. It is true that if she had employed counsel as soon as she became of age, in the lifetime of both the life tenants, it is probable that such counsel would have discovered the true state of the affair, but I can find no authority for debarring her from relief because she was not diligent in ascertaining just what her rights were when, as here, the mystery surrounding them was due to the neglect of duty of the trustee. It was his duty to keep a record of his dealings with both estates, and he kept none; and to render an account of those dealings either to the *cestui que trust* or to the court, voluntarily, and he rendered none. The duty to account arose at least as soon as the youngest child of Samuel T. Dodd arrived at age, and that could not have been later than 1871, for the father died in 1849.

There must have been some sort of a settlement in 1873, when the old mortgage was canceled and the new one taken. To believe otherwise is to charge Calvin Dodd with utter neglect of his duty. But if any such settlement was had, no record of it was kept or rendered. It may be, as before suggested, that Van

Orden induced Calvin Dodd to act upon the release, for value, given by the four children. Be that as it may, the new mortgage was not recorded, and these helpless ladies were left entirely in the dark as to the condition of their affairs, and for this ignorance the executor was responsible. That being so, it seems to me that it does not lie in his mouth to say to the complainant, you might have ascertained the facts if you had employed competent counsel.

The result is that the defence of lapse of time fails in whatever view we take of the case. The complainant had no right at law till the death of her mother, in 1892; and if she had a right in equity, it was one which it is doubtful, at least, if she was under any obligation to enforce until her mother's death, and she is not in the situation of being chargeable with having knowingly slept on her rights.

It follows that the complainant, as the sole legatee of her father, Stephen H. Dodd, is clearly entitled to relief against the answering defendant, as sole legatee of Calvin Dodd, the only one of the negligent trustees who has left any property. The only question is as to the amount which she is entitled to recover.

Clearly, she is not entitled to any part of the interest on this fund during her mother's lifetime. For that interest, the personal representative of her mother must sue.

The only remaining question is as to whether there is any presumption here that the other children of Samuel Tyler Dodd, the first testator, have any interest in this fund which can or should be recognized and protected in this suit. The bond and mortgage was given to Dodd and Ward, as executors of Stephen H. Dodd, deceased. *Prima facie*, the money belonged to his estate. If his brothers and sisters had any interest in it, they should make claim against his estate for it. No such claim has ever been made so far as appears. The evidence shows that they did receive substantial payments from Van Orden. Israel Dodd received a payment from him in addition to the payment which he previously received from Stephen H. Dodd at the time he gave him his conveyance. On the back of one of the exhibits hereinbefore set out, are receipts from the other brothers and

sisters for shares in the fund, and the release from the four children, which was put on record at the date that the $1,500 bond and mortgage was given, is expressed to be in consideration of $1,000. Such papers as are in the handwriting of Isaac L. Van Orden show a great confusion of ideas, and it is not easy to interpret them. The fact remains that when the $3,000 bond and mortgage was surrendered and the $1,500 bond and mortgage taken in its place, no money was paid to the complainant or her mother, while the other legatees of Samuel T. Dodd did receive money and have made no claim for any part of this fund, although some of them had notice of the suit. And I think that the fair presumption is that the whole of this fund belongs to the complainant.

In the absence, then, of any defence based on the contrary notion, I will advise a decree in favor of the complainant against the answering defendant, for $1,500, with interest from the date of the death of her mother.